[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The parties to this case are the parents of Allison McGahie, born April 11, 1991; their marriage was dissolved by this court on March 8, 1996. At the time of the divorce, the parties entered into a stipulated judgment providing that they would be joint custodial parents of Allie and would have a shared parenting arrangement by which each would have the child with them approximately one half of the time. The plaintiff mother has moved for a modification of custody because of her desire to relocate with the child to Vermont. The defendant father has moved that the child's primary residence remain with him in Connecticut.
Although this case raises many of the issues in the landmark Connecticut relocation case, Ireland v. Ireland, 246 Conn. 413
(1998), it presents a different factual pattern because here the parties have shared custody and neither parent is designated in the original judgment as the primary residential parent. Accordingly, the burden shifting requirements of Ireland were inappropriate to this case. The court required and the plaintiff undertook that the plaintiff would bear the burden of proving all essential facts; the defendant was not required to assume the burden of proving that the move would not be in the best interests of the child. See, id., 428-29.
The court's authority to modify a custody decree is conferred by statute, which requires that the court's decision must be guided by the best interests of the child. Connecticut GeneralStatutes, Section 46b-56. In order to prevail on a motion to modify custody, the movant must prove by a preponderance of the evidence, Cookson v. Cookson, 201 Conn. 229, 240 (1986), that there has been
. . . a material change of circumstances which alters the court's finding of the best interests of the child or a finding that the custody order sought to be modified was not CT Page 3594 based upon the best interests of the child.
Hall v. Hall, 186 Conn. 118, 122 (1982). Because the original custody order was based on the best interests of the child, the plaintiff was required to prove a material change in circumstances affecting the court's findings of the child's best interests.
Not all changes in circumstances since the date of the judgment are material. Simons v. Simons, 172 Conn. 341, 344 (1977). Although a change in circumstances since the prior order of the court is required, the ultimate test is the best interests of the child. Brubeck v. Burns-Brubeck, 42 Conn. App. 583, 585 (1996), citing Stewart v. Stewart, 177 Conn. 401, 407-408
(1979); Ireland v. Ireland, 246 Conn. 413, 430 (1998). In addition, in considering the desire of a parent to relocate with a child to a different state, the court must consider the factors endorsed by the Supreme Court in Ireland:
 "[E]ach parent's reasons for seeking or opposing the move, the quality of the relationships between the child and the custodial and noncustodial parents, the impact of the move on the quantity and quality of the child's future contact with the noncustodial parent, the degree to which the custodial parent's and child's life may be enhanced economically, emotionally and educationally by the move, and the feasibility of preserving the relationship between the noncustodial parent and child through suitable visitation arrangements . . . the negative impact, if any, from continued or exacerbated hostility between the custodial and noncustodial parents, and the effect that the move may have on any extended family relationships."
Ireland v. Ireland, 246 Conn. 413, 431-32 (1998). These factors are not exclusive, and no single factor may be presumed to have dispositive weight Id., 434. While these factors are expressed in terms of custodial and noncustodial parents, a situation which does not exist in this case, they must still be considered, particularly where at least one of the possible outcomes of this case will result in the creation of a primary custodial parent.
Both parents in this case are good, decent, productive and devoted people who have worked consistently from the time of their separation until this dispute to assure that Allison would have positive experiences with both of her parents and all of CT Page 3595 their respective extended families. The judgment provides a parenting schedule by which the child spends alternate weeks with each parent, interrupted once during the mother's week by a visit with the father and twice during the father's week by a visit with the mother. The defendant calculates credibly that he spends approximately forty-two percent of each year with his daughter. The judgment also provides that Allison will attend Glastonbury schools and that her residence cannot be removed from Glastonbury by either parent without the consent of the other or a court order.
The plaintiff married Harry Mueller in late 1996, and has an infant child with him. Mr. Mueller was employed at Thames Press as a production manager at a salary of approximately $56,000.00 per year until July, 1998, when he accepted a position as general manager of the Stinehour Press. Stinehour is a subsidiary of Milton Holding Co., an Irish company, and is engaged in high quality printing. Mr. Mueller is now chief operating officer of the company, earning a base salary of $85,000.00 with an additional $15,000.00 available to him as bonus. His prior job was stressful and unhealthful, and there were no opportunities for him in Connecticut to achieve the monetary success and professional satisfaction which he has earned in Vermont.
The plaintiff is also a graphic designer, but has historically worked independently. She has never earned a great deal of money from her work, although her company grossed nearly $45,000.00 in 1999 even though she stopped working before the end of that year because of Patrick's birth. Virtually all of that sum, however, was earned from the Milton Holding Co., for which her husband works. Milton offered her a job as a marketing executive in May, 1999 at an annual salary of $60,000.00, but when she was not able to come to Vermont to begin work, the offer was withdrawn and the job was given to an employee working in New York City. However, the job of marketing director again became available recently on a consulting basis, and the plaintiff has an opportunity to seek it. Her employment prospects are better in Vermont than they are here, both because of her family's relationship with the Stinehour Press and because steady work of the kind offered by Stinehour is more remunerative and time efficient than independent work, which necessarily involves considerable time developing a clientele and soliciting contracts.
Allison has attended the Buttonball School in Glastonbury through the current year, when she is in third grade. Because of CT Page 3596 the grade alignment of the Glastonbury schools, however, she would be required to change schools at least three times if she remains in Glastonbury. In any case, the ability of the plaintiff to remain in Glastonbury was tenuous if not non-existent because of the limited economic means the parties had while they were living there. Those limitations on income were not occasioned by the plaintiffs, temporary withdrawal from the work force because of Patrick's birth, but rather by the nature of the business in which she and her husband were engaged.
The defendant is a computer programing professional at a company in Hartford, where he has been employed for many years. His activities in the child's life include church, coaching the traveling soccer team she plays on as well as being involved in other sporting activities, encouraging her musical pursuits, and spending time with her at home or at his parents house. He is close to his parents, both delightful people who enjoy a positive relationship with Allison. The defendant has managed his child care duties over the years by coordinating his work schedule around the child's schedule of time with him. He has also taken the extraordinary step of taping stories for Allison so that he can read to her when she is not with him.
In addition to her parents, Allison enjoys all of the various people who she identifies as her family. These include Mr. and Mrs. McGahie, her grandparents, with whom she spends a lot of time; her maternal grandmother and grandfather, with whom she and the plaintiff are presently living; her step-father and his two nearly grown children from a prior marriage; and Patrick, her new baby brother. When she was asked to draw her family, all eleven people appeared in the drawing without any particular hierarchy.[1] The amount of time she could spend with her grandparents and step-siblings if she were to move to the Lunenberg, Vermont area would be diminished, but the evidence does not establish that her relationships with these people would suffer in quality. The McGahie's enjoy a very good relationship with their other grandchildren, who live in Massachusetts and New Hampshire. Allison's step-siblings are far older than she and engaged in their own activities.
There is no evidence in this case that would seriously bring into question the ability of either the plaintiff or the defendant to parent the child effectively. They have some philosophical and behavioral differences in their approach to her, and have had difficulties communicating about some issues in CT Page 3597 the past. These difficulties, which have not been severe until recent months, are caused in large measure by the defendant's reticence to discuss issues with the plaintiff. However, their differences and difficulties in communication have been insignificant in contrast to their positive contributions to Allison. The plaintiff has always fostered a complete relationship between the child and the defendant, and will likely continue to do so in the future. The plaintiffs decision to move to Vermont was not made to disrupt Allison's relationship with her father, and she is very committed to making that relationship work.
After the case was continued on February 9, 2000 to allow the defendant additional time to obtain a new attorney, he began to involve Allison in the court controversy. He had been advised by the evaluator that it would be inappropriate for him to comment on the case to the child. He appropriately refrained from doing so until February 9. After that date, and because he justifiably became concerned that he was disadvantaged because he had not had the opportunity to express his wishes to the child although her mother had not been under a similar handicap last summer, he began to introduce to the child the issues he perceived were raised by these proceedings. The court does not fault the defendant for those beliefs or criticize him for engaging in the conversations. However, it is regrettable that his methods had the effect of creating fear and anxiety in the child. As a result of his discussions with the child, she began to express an apparent preference to remain in Connecticut. She wrote a journal entry which she made available for her mother to see. It stated:
Dear Mom,
If I had a wish + it could be anything . . .
 It would be to be with everybody at the same time. Not ever in a different state or country but to be with everybody at the same time, + the same place.
So what I am trying to say is . . .
 I don't want to move ***only visit daddy sometimes*** So do you see what daddy + I mean? *** I'd be being stretched out to many times.
The letter was signed Allison and Pete, and headed with a note CT Page 3598 that it should be given to Daddy because "he needs it." The court does not believe that the defendant authored this letter or coerced the child into writing it, and the anxieties about change it expresses are undoubtedly real. However, the court does conclude that Allison wrote it to help her father. The letter and other recently expressed wishes of the child must be read in light of the teaching of our Appellate Court:
 A child caught up in the maelstrom of family strife may produce, to the psychologically untrained eye and ear, distorted and thus misleading images not only of the child's parents but of the child's own feelings; and those feelings themselves may be transient.
Gennarino v. Gennarino, 2 Conn. App. 132, 137 (1984). Although the statute requires the court to consider the wishes of a child, the child's best interest is the controlling standard for the court's decision. The court does not ignore the child's stated wish not to move, but rather reads it in light of the remaining evidence.
There has been a material change in the circumstances of the parties. The plaintiff has remarried, has had another child, and has formed a family which has better economic and career opportunities for both adults in Vermont. Although Allison's love for her father and her paternal grandparents is real, deep, and compelling, and although they richly deserve and enthusiastically share that love, her primary bond is with her mother.
Her mother, the plaintiff, is a principled and extremely credible person who is also completely devoted to Allison. Her parenting style is more focused on instilling in the child a sense of independence, resourcefulness, and self-discipline, and she does not appear to be a doting parent. She is justifiably devoted to her husband and baby, as well, but has maintained a cordial and respectful relationship with the defendant and his family. Although the defendant has done nothing ever to interfere with the child's relationship with her mother, the plaintiff has been the primary force in building and encouraging Allison's relationship with her father and his extended family. The defendant has been deeply involved in Allison's life, both in terms of time and dedication, but the plaintiff has been the child's primary caregiver, her confidante, the person she turns to when afraid. Moreover, despite the child's expressed desire not to move away, it is clear that she also regards her mother as CT Page 3599 her core parent. Her father is important to her, and loved by her, but he is the parent she "visit[s]." When she initially heard about the proposed move, she was excited and clearly assumed she would be going. Even after she began to express reservations about moving, she planned to go. Her letter to her grandfather illustrates this point. She wrote him the same day she wrote the journal entry describing her desire not to move. Her letter assured him that she would be coming back to visit. There is no evidence that Allison would prefer to have primary residence with her father.
The maintenance of the status quo in this case is not possible. First, it is untenable for the plaintiff, Allison, and Patrick to continue to live with her parents in their Glastonbury home while Mr. Mueller works and lives in Vermont. Secondly, it is contrary to Allison's interests that her mother and step-father be forced to forego the professional, personal, and economic opportunities they have in the Lunenberg, Vermont area but do not have here. At the time of the divorce, the parties agreed and the court determined that Allison's best interest were served by a joint parenting plan allowing her nearly equal time with both her parents in this area.
 A child's best interests, however, cannot be prospectively determined . . ."[T]he court [is] bound to consider the child's present best interests and not what would have been in [her]best interests at some previous time."
Guss v. Guss, 1 Conn. App. 356, 360-61 (1984) (citation omitted; emphasis in original).
It is in the best interests of Allison that she live primarily with the plaintiff, subject to liberal and frequent visitation with the defendant, and that the plaintiff be permitted to relocate with her to the Lunenberg, Vermont area.
The custody evaluation performed by Thomas Fulop in this case was not sufficiently detailed to be helpful to the court in formulating its decision. While Mr. Fulop is a credible witness, some of whose factual observations of the parties, the child, and the child's schedule were helpful to the court, he did not devote sufficient time to his investigation given the complexities of this situation. Moreover, the two so-called instruments he used in interviewing the child were not suited to the facts presented by this family. Accordingly, the court did not rely on Mr. CT Page 3600 Fulop's opinion in reaching its decision.
The defendant argues that the appropriate amount of child support is $116.75 per week, based upon his income and one half of Mr. Mueller's income. The plaintiff argues that support must be calculated without consideration of Mr. Mueller's income, and that such a calculation would result in a support order of $163.00. The Child Support Guidelines do not ordinarily permit the court to factor the income of a new partner into the support of a child not the dependent of that child. Child Support andArrearage Guidelines, August 1, 1999, Preamble, (f) (1) (B) (ii). However, it does permit the partner's contributions to be considered where the recipient parent has reduced her income or experienced a reduction in her living expenses as a result of those contributions. Id., (h) (2). Accordingly, Mr. Mueller's income must be taken into account. Mr. Mueller is paying $300 per week in alimony for his former wife and support for their children.[2] The presumptive amount of support according to the guidelines is $117.00.
Based upon the evidence, the recommendations of the guardian ad litem, the court's findings of fact, and applicable statutory and case authority, the court enters the following orders.
1. The parties will share joint legal custody of Allison McGahie, born April 11, 1991, and she shall reside primarily with the plaintiff subject to liberal access between the child and the defendant.
2. The plaintiff shall be permitted to move to the area of Lunenberg, Vermont to establish a residence for herself and her family, including Allison. That residence may be in either Vermont or New Hampshire, but shall not be more than thirty miles north, east, or west of Lunenberg, Vermont, it not being in the best interests of Allison to be any further from her father than that distance, nor more than fifteen miles from a major highway providing access to the Hartford, Connecticut area.
3. Each parent shall continue to foster the close, loving, respectful, and positive relationship that the child has with the other and with the other's extended family, and shall ensure that other members of their families do so as well.
4. The child shall have open access to the parent with whom she is not staying at any particular time by telephone, e-mail, CT Page 3601 and mail, but the parent with whom she is not staying shall not initiate telephone contact with Allison more than once daily for not more than fifteen minutes and shall not initiate excessive e-mail contacts.
5. Except as otherwise or necessarily modified by these orders, all other provisions of the judgment shall remain in effect.
6. The plaintiff shall not relocate from Vermont except to Connecticut without sixty days prior notice to the defendant.
7. The defendant shall not refer to the members of the plaintiffs extended family as "step" or "half' members, or in any derogatory way.
8. Both parties shall immediately notify the other of any serious or emergency health issues involving the child when she is with them, and shall keep the other party informed of routine health matters involving the child.
9. Neither party will pay the attorneys fees of the other incurred in connection with this litigation.
10. The defendant shall pay the plaintiff child support in the amount of $100.00 per week commencing on the date that Allison and the plaintiff establish residence in the Vermont area. This is a deviation from the guidelines support of $117.00 which is justified by the increased costs of visitation that will be incurred by the defendant. The court finds that the plaintiff will also bear some of the increased transportation expenses because of the exchange arrangements which are ordered.
11. Whenever the plaintiff is remaining in Vermont at a time that the defendant is exercising visitation in Connecticut or elsewhere (except in the Lunenberg area), the plaintiff shall take the child to the defendant's brother's home in Westmoreland, New Hampshire, where the defendant shall pick her up. Whenever the plaintiff is returning to Connecticut at a time the child has visitation with her father, the plaintiff shall deliver the child to the defendant's home, and the defendant shall return the child to the plaintiffs Connecticut location at the end of the visitation. Whenever the defendant exercises visitation in the Lunenberg area, he shall pick up and return the child at the plaintiffs home. The parties shall work out the times of drop off and pick up, but the court will retain jurisdiction to determine CT Page 3602 those times if the parties are not able to agree. It is ordered that visitation shall begin on Friday evenings and shall end on Sunday evenings, or on Monday evenings when a Monday holiday (as defined herein) occurs during a visitation. It is further ordered that Allison shall arrive in Westmoreland not later than 5:30 p. m. at the commencement of visitation and shall be returned there in time for her to be at her home not later than 6:00 p. m.
12. The current visitation schedule shall end on April 14, 2000. Commencing on that date, the child shall be in the mother's care except (a) as ordered herein or (b) as the parties may agree. The defendant shall have parenting responsibilities and access to the child for visitation away from the child's principal residence as follows:
a. The weekends of April 28; May 5; May 20; June 2; June 16; June 30; August 4; September 8; September 22; October 6; October 20; November 3; November 24; December 8; and December 22, 2000.
b. The weeks of June 30-July 16, 2000; and August 11 through August 27, 2000.
c. December 26 through December 30, 2000.
d. Additional dates in 2001 that are consistent with this schedule as determined by the court, which retains jurisdiction, or by the agreement of the parties.
13. The defendant shall have the right to exercise visitation in and around the community where the child lives on either Saturday or Sunday of the following weekends from 10:00 a.m. until 8 p. m.: June 24; July 29; October 28; November 18, 2000; and additional days in 2001 that are consistent with this order or to which the parties agree, the court retaining jurisdiction over this issue. It is the court's intention that the defendant shall have the opportunity to have not less than eight of these "wildcard" days annually in addition to the other visitation set forth.
14. In 2000, Allison shall have Good Friday, Easter, Memorial Day, Labor Day, Thanksgiving Day, and Christmas Day with the plaintiff. In 2001, Allison shall have Good Friday, Easter, and Thanksgiving Day with the defendant, and Christmas Day with the plaintiff Thereafter, that schedule shall alternate yearly. Labor Day will always be with the plaintiff since that holiday CT Page 3603 corresponds with the beginning of school. Martin Luther King Day, President's Day, Memorial Day, July 4th Columbus Day, and Veteran's Day will be spent with whatever parent has the child that weekend, provided that the defendant is entitled to at least as many three day weekends in any year as the plaintiff.
15. In 2000, the plaintiff has Allie during her Easter vacation and the defendant has her for most of her Christmas vacation. In 2001, the plaintiff shall have Allison for winter vacation and her Christmas vacation except for Christmas Day, and the defendant shall have her for Easter vacation. Thereafter, this schedule shall alternate annually.
Orders will enter accordingly.
GRUENDEL, J.